BRYSON (PARET v.). See Case No. 10,710.

---

## Case No. 2,072.

### The B. S. SHEPPARD.

[1 Biss. 221.][1]

District Court, N. D. Illinois. Dec. Term, 1857.

COLLISION — CANAL BOATS IN CHICAGO RIVER — VESSELS APPROACHING BENDS—HEADWAY—CITY ORDINANCES.

1. In navigating the Chicago river, canal boats are not, except under special circumstances, bound by the rule that applies to vessels, which is—they must have a boat astern with a line ready to be thrown ashore in case of emergency.

2. Where a barque in tow of a tug is approaching a bend in the river, where it is narrow, and vessels are lying at the side, extreme caution should be used, and it matters not that at the time of the collision her motion was moderate, if, from a want of care immediately before, it was out of her power to check her headway at the proper time. The barque should have had her anchor where it could be let go at once.

3. This court is not in all cases bound by the city ordinances regulating navigation.
[See The Palmetto, Case No. 10,699.]

[In admiralty. Libel by the owner of the canal boat Buffalo for damages sustained by collision. Decree for libellant.]

Clarkson & Tree, for libellant.
Hooper & Clement, for respondent.

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

DRUMMOND, District Judge. On the 16th of September, 1856, the canal boat Buffalo, in company with several other canal boats, two abreast, was coming down the south branch of the Chicago river, on her way from Bridgeport to this city, in tow of the steam tug Hiram Warner. The canal boat was loaded with oats and corn, and was owned by the libellant. It was between eight and ten o'clock in the morning, and the tug, with its tow, was proceeding at a moderate rate, keeping close to the right bank of the river, and not far from Polk street bridge. The barque B. S. Sheppard was going up the river in tow of the tug Walter M'Queen. Near the place where they met there is a bend in the river, the south branch sweeping round somewhat to the west in its course to the lake. It will be seen therefore, that a tug proceeding up the river with a tow hugging the left bank of the stream at that point, would naturally head-reach across the river towards the right bank in turning the bend, and the tendency would be in proportion to the speed of the vessel. This is what actually occurred in the case before the court. The barque did not seem to be under perfect command, or from some cause, she headed too much towards the east, and came in collision with the Buffalo, and with her anchor knocked a hole in the larboard bow of the canal boat, doing considerable damage to the hull and cargo; for which the libel is filed. The Buffalo was next to the Hiram Warner, and as the danger of the collision became imminent, word was passed to those on the barque to let go the anchor. This, however, was not attended to, and as already stated, the collision took place. The anchor of the barque was hanging from the cat-head on her larboard bow, by the ring-stopper, with the flukes in the water. It had been previously slacked down, but was not, in fact, let go until after it had struck and fastened into the canal boat, when its weight carried it to the bottom. The river at the place of collision is quite narrow, and there was, besides, a vessel lying on each side moored to the dock. A short time before the collision, the barque had a stern line out, fastened ashore, and was in the act of checking her speed at the time; and the weight of the evidence seems to be, that at the moment of actual collision her motion was inconsiderable.

The first question is, was there any fault on the part of the Buffalo or on the part of the tug that had her in tow? After an attentive consideration of the evidence, the court cannot say there was. The speed of the Hiram Warner, with its tow seems not to have been unusual or improper. They were well over to the right bank of the river. The only complaint made is that the canal boats ought to have had their lines out as the barque had, and it is insisted if this had been done no collision would have taken place, and such appears to be the opinion of some of the defendant's witnesses. But we must not lose sight of the distinction between a canal boat and a barque like the B. S. Sheppard. This court has already frequently ruled that when a vessel is passing up or down the Chicago river, whether in tow of a tug or not, a boat astern with a line ready to be thrown ashore in case of emergency, is a proper and necessary precaution. The court has no doubt of the soundness of this rule; it is a salutary and practicable one with vessels which are and shall be provided with boats. Canal boats are different; they are not usually attended by row-boats, and it would in the nature of things be impossible that they should always be able to meet such a requisition. The court does not intend to intimate but that there may be circumstances where it would be a fault for a canal boat not to throw out a checking line to arrest its way. That is to be determined when the case arises. In this case, I do not consider that those on the canal boat were bound, under the facts as established, to have lines astern. I do not well see how it could have been availing to prevent the collision; that is, there was no sufficient time, with the means at the disposal of the canal boat, after the collision seemed probable, to accomplish the object proposed—that of checking with a line astern. It is to be observed that it was but a moment, as it were, that they could count on, and the thing to be determined is whether they did all they could at the particular juncture to avoid the collision with the barque. On the whole, I cannot say that they could have prevented it at the time; nor do they appear to have done any act immediately preceding which tended to bring about the collision.

With the barque it was different. The evidence is of course conflicting. To those on board of the barque it was the canal boat that run against their anchor and into their vessel. The passion and excitement of the moment give form and color to the statement of each witness. It is only by taking some leading facts, and by placing ourselves as cool spectators in the midst of so much confusion, that we can judge fairly of the event. How much reliance is to be placed upon the account of this or that witness as to what occurred in the great tumult, need not be determined. There are some facts which are free from doubt. The B. S. Sheppard with its tug was approaching a turn in the river; the river itself was there quite narrow; a vessel was lying on each side; it was at a time when they were likely to meet vessels coming down. It is manifest, under these circumstances, extreme caution should have been used. If, as is stated by some of defendant's witnesses, it was impracticable for the two tows to pass at that point without coming in contact, the greater the necessity for caution and vigilance. Now it may be conceded that on the instant before the actual collision the barque was not moving

at too rapid a rate, but I think it clear that in approaching the bend her speed was too great under the circumstances. The result was, in attempting to turn she had so much headway on her that with all their efforts, aided by a line fastened ashore, she would not mind her helm quick enough, and in the language of some of the witnesses, she head-reached across the stream and thus caused the collision. That this was the fact is made the more apparent from the circumstance that the fellow of the Buffalo sheered over to the starboard side of the barque, the latter in her progress dividing, as it were, the two canal boats which were towing abreast. It matters not that the motion of the barque was moderate at the time, provided, by a want of care immediately prior to the collision,—as for example, by too much headway,—it was out of their power to check their vessel at the proper time. No doubt as soon as they saw the probability of a collision they did all that they could to avoid it, but the fault consisted in their putting themselves in such a condition they could not soon enough stop their vessel. The error, therefore, I think, on the part of the Sheppard and of her tug, was in not using the needful precaution in approaching the bend of the river.

Again, there was a serious fault on the part of the barque in relation to the anchor. I had occasion fully to consider this point in the case of The Palmetto [Case No. 10,699], decided about a year since in this court. It is true the facts in that case were somewhat different. There the vessel was lying at the wharf discharging her cargo, and while there the collision took place; but the main ground upon which the Palmetto was held to be in fault in that case, was because the anchor was not out of the way. No doubt the case is much stronger against a vessel at the wharf when the anchor is permitted to remain where it may strike a passing vessel, because when the craft is in motion it may be right and proper for the anchor to be in such a position that it can be let go on the instant. It is said that the ordinance of the city required the anchor of the Sheppard to be hanging at the forefoot. I do not consider myself bound in all cases by the city ordinances as to these matters. If the anchor was in a proper place and the proper conduct had been observed in relation to it, I should not, in this respect, hold the barque responsible, because technically it had not complied with the ordinance as to the anchor. The B. S. Sheppard had her anchor at the cat-head. The ordinance requires it to be dropped under the forefoot. There was therefore a clear violation of the ordinance, even if we take the opinion of one of the witnesses, that the anchor is under the fore-foot when it is suspended from the ring stopper at the cat-head, a foot or two from the bottom of the vessel. However this may be, it is clear the anchor should be where it can be let go without delay. If this had been done in this case, most, if not all, the injury and damage would have been avoided. They let go the anchor after it had struck the canal boat; but then, as one of the witnesses told them, and the same one who had shouted to them to drop their anchor, it was too late; the thing was done. The truth seems to be that there was the feeling on board of the B. S. Sheppard, so common on these occasions, that theirs was the stronger and heavier vessel, and they, at any rate, would not be likely to suffer. This feeling not unfrequently produces carelessness and indifference at the time, and it certainly should not be countenanced by courts of justice. One objection made to the anchor hanging under the forefoot, or by a chain from the hawse-pipe, by the mate of the barque is, that if it had been suspended there it would have been likely to come in contact with something and thus endanger the vessel which bore it. And yet this same witness insists that the barque had no motion at the time, "not over two feet an hour." It is manifest that if an anchor is permitted to hang at the side of the vessel as it comes in contact with another, the risk of loss is immensely increased, and the only safe rule to adopt is to require it to be dropped out of harm's way, and if need be to the bottom, in all cases where it is practicable. Here it is clear it could and ought to have been done, and for not doing it the B. S. Sheppard was in fault. I shall therefore pronounce a decree for the libellant for the amount of damage which has been proved together with costs.

NOTE [from original report]. Steamers navigating crowded harbors or channels, or entering ports in the dark or in fogs, are bound to move with the greatest care, and to keep themselves under a headway at all times controllable, and sometimes to stop entirely, and where it is night or misty, to wait till they can see. In all such cases they must conform strictly to the rules of navigation; the rule applied in various cases. The Corsica, 9 Wall. [76 U. S.] 630; The Johnson, Id. 146; The City of Paris, Id. 634; The Portsmouth, Id. 682; The Syracuse, Id. 672; The Suffolk County, Id. 651. Those having no tows, bound to regard with care those having them. The Alleghany, Id. 522; The Syracuse, Id. 672. If either one of two vessels colliding' has departed from the rules of navigation established by congress, it must show cause for such departure. The Corsica, Id. 630. As to duty of vessels in Chicago river, see, also, The Brothers [Case No. 1,969]. Where a vesssel runs into another moored at a wharf, there is a presumption of negligence on her part. The Bridgeport [Case No. 1,861]; The Helen R. Cooper [Id. 6,334].